**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LOUIS SCARANTINO, On Behalf of Himself
and All Others Similarly Situated,

    Plaintiff,

     v.

CARDCONNECT CORP., JEFFREY
SHANAHAN, RICHARD GARMAN,
CHRISTOPHER WINSHIP, PETER BURNS,
TOOS N. DARUVALA, RONALD L.
TAYLOR, FIRST DATA CORPORATION, and
MINGLEWOOD MERGER SUB INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

CLASS ACTION

DEMAND FOR JURY TRIAL

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.  This action stems from a proposed transaction announced on May 29, 2017 (the "Proposed Transaction"), pursuant to which CardConnect Corp. ("CardConnect" or the "Company") will be acquired by First Data Corporation ("Parent") and Minglewood Merger Sub Inc. ("Merger Sub," and together with Parent, "First Data").

2.  On May 26, 2017, CardConnect's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, First Data commenced a tender offer, set to expire on July 5, 2017, and stockholders of CardConnect will receive $15.00 per share in cash.

3.      On June 8, 2017, defendants filed a Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of CardConnect common stock.

9.      Defendant CardConnect is a Delaware corporation and maintains its principal executive offices at 1000 Continental Drive, Suite 300, King of Prussia, PA 19406.  CardConnect's common stock is traded on the NasdaqGM under the ticker symbol "CCN."

10.     Defendant Jeffrey Shanahan ("Shanahan") is a director of CardConnect as well as the Company's President and Chief Executive Officer ("CEO").

11.     Defendant Richard Garman ("Garman") is a director of CardConnect.

12.     Defendant Christopher Winship ("Winship") is a director of CardConnect.

13.     Defendant Peter Burns ("Burns") is a director of CardConnect.

14.     Defendant Toos N. Daruvala ("Daruvala") is a director of CardConnect.

15.     Defendant Ronald L. Taylor ("Taylor") is a director of CardConnect.

16.     The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

17.     Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

18.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of CardConnect (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable.  As of May 25, 2017, there were approximately 31,472,060 shares of CardConnect common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

26.     CardConnect is an innovative provider of payment processing and technology solutions, helping more than 67,000 organizations – from independent coffee shops to iconic global brands – accept billions of dollars in card transactions each year.

27.     Since its inception in 2006, CardConnect has developed advanced payment solutions backed by patented, PCI-certified point-to-point encryption ("P2PE") and tokenization.

28.     The Company's small-to-midsize business offering, CardPointe, is a comprehensive platform that includes a powerful reporting and transaction management portal which extends to a native mobile app.

29.     Additionally, CoPilot is a centralized business management tool to help distribution partners manage their business.

30.     For enterprise-level organizations, CardSecure integrates omni-channel payment acceptance into several ERP systems – such as Oracle, SAP, JD Edwards and Infor M3 – in a way that minimizes PCI compliance requirements and lowers transaction costs.

31.     On March 10, 2017, CardConnect issued a press release wherein it reported its financial results for the fourth quarter and full-year ended December 31, 2016.

32.     For the fourth quarter of 2016, revenue increased 23.0% to $156.8 million as compared to $127.5 million in the prior-year period.  Net revenue increased 26.2% to $41.6 million as compared to $32.9 million in the prior-year period.  Bankcard volume was $5.9 billion, a 24.6% increase from $4.8 billion in the prior-year period.

33.     For the full-year 2016, revenue increased 28.5% to $589.3 million as compared to $458.6 million in the prior-year period.  Net revenue increased 29.7% to $156.5 million as compared to $120.6 million in the prior-year period.  Bankcard volume was $22.3 billion, a 30.8% increase from $17.1 billion in the prior year.

34.     With respect to the financial results, Individual Defendant Shanahan commented:

I am very excited to continue the trend of strong organic net revenue growth in both the fourth quarter and full year 2016.  Our impressive growth in 2016 is a direct reflection of our ability to continue to take share in the integrated payments market via our differentiated product offering that delivers best in class payment security and integration services.  Our go-to-market strategy continues to shift toward software partners that are looking for a unified payments platform inclusive of merchant acquiring, gateway services, and secure device integration.  We recently released Bolt, which brings the power of point to point encryption to any software application via a developer friendly API.  We believe Bolt positions us to significantly scale our customer base due to the ease of integration it provides our new customers.  We expect a major theme in 2017 will be a significant reinvestment back into the business, specifically in product development and in strengthening our sales and marketing organization.

35.      On May 10, 2017, CardConnect issued a press release wherein it reported its

financial results for the first quarter ended March 31, 2017.  Revenue increased 20.5% to $156.7

million as compared to $130.0 million in the prior-year period.  Net revenue increased 19.3% to

$41.1 million as compared to $34.4 million in the prior-year period.  Bankcard volume was $6.0

billion, a record 22.8% increase from $4.9 billion in the prior-year period.  With respect to the

financial results, Individual Defendant Shanahan commented:

> Fiscal 2017 is off to a strong start.  Most importantly, organic bankcard volume
> grew a record 22.8% in the first quarter of 2017 compared to the prior year
> quarter[.] Volume growth was again primarily driven by our unique value
> proposition in the integrated payments market where we offer software partners a
> unified payments platform delivered with best in class payment security.  As part
> of our 2017 strategy to invest for future growth, early in the second quarter, we
> acquired MertzCo, Inc., who was our largest value-added reseller.  We are thrilled
> to have someone with Michael Mertz's track record of success leading our
> sales.  Additionally, we are executing on our organic growth plan, both in sales and
> technology.  We are also providing updated guidance for 2017 as a result of the
> MertzCo transaction.

36.      Nevertheless, the Board caused the Company to enter into the Merger Agreement,

pursuant to which CardConnect will be acquired for inadequate consideration.

37.      The Individual Defendants have all but ensured that another entity will not emerge

with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement

that prohibits the Individual Defendants from soliciting alternative proposals and severely

constrains their ability to communicate and negotiate with potential buyers who wish to submit or

have submitted unsolicited alternative proposals.   Section 6.4(a) of the Merger Agreement states:

> (a) Except as expressly permitted by this Section 6.4, the Company shall, and shall
> cause each of its Affiliates and its respective directors and officers, and shall use
> reasonable best efforts to cause each of its financial advisors, investment bankers,
> attorneys, accountants and other agents and representatives (collectively, with its
> or, as applicable, any other entity's, Affiliates and its and their respective officers,
> directors, employees and agents, its "Representatives") to: (i) immediately cease
> and cause to be terminated any discussions or negotiations with (and provision of
> information to) any persons (other than Parent) that may be ongoing with respect

to a Company Takeover Proposal and (ii) not, directly or indirectly, (A) solicit, initiate, knowingly encourage or knowingly facilitate any inquiries regarding, or the making of any proposal or offer, including any proposal or offer to its stockholders, that constitutes, or could reasonably be expected to lead to, a Company Takeover Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other person any information in connection with or for the purpose of encouraging or facilitating, a Company Takeover Proposal (other than, solely in response to an unsolicited inquiry, to ascertain facts from the person making such Company Takeover Proposal for the sole purpose of the Company Board informing itself about such Company Takeover Proposal and the person that made it and to refer the inquiring person to this Section 6.4 and to limit its conversation or other communication exclusively to such referral and such ascertaining of facts) or (C) approve, recommend or enter into, or propose to approve, recommend or enter into, any letter of intent or similar document, agreement, commitment, or agreement in principle with respect to a Company Takeover Proposal. The Company acknowledges and agrees that any action taken by any Representative of the Company which, if taken by the Company, would be a breach of the provisions set forth in this Section 6.4 shall be deemed to constitute a breach of this Section 6.4 by the Company.

38.     Further, the Company must promptly advise First Data of any proposals or inquiries

received from other parties.  Section 6.4(c) of the Merger Agreement provides:

(c) The Company shall promptly (and in no event later than twenty-four (24) hours after receipt) notify Parent in writing in the event that the Company or any of its Representatives receives a Company Takeover Proposal or any offer, proposal, inquiry or request for information or discussions relating to the Company or its Subsidiaries that would be reasonably likely to lead to or that contemplates a Company Takeover Proposal, including the identity of the person making the Company Takeover Proposal or offer, proposal, inquiry or request and the material terms and conditions thereof (including a copy of such Company Takeover Proposal, offer, proposal, inquiry or request or, where such Company Takeover Proposal, offer, proposal, inquiry or request is not in writing, a description of the material terms thereof). The Company shall keep Parent reasonably informed, on a reasonably current basis (but in no event more often than once every twenty-four (24) hours, as to the status (including any material developments, discussions or negotiations) of such Company Takeover Proposal, offer, proposal, inquiry or request. The Company agrees that it and its Affiliates will not enter into any agreement with any person subsequent to the date of this Agreement which prohibits the Company from providing any information to Parent in accordance with, or otherwise complying with, this Section 6.4.

39.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out"

provision permitting the Board to withdraw its approval of the Proposed Transaction under

extremely limited circumstances, and grants First Data a "matching right" with respect to any

"Superior Proposal" made to the Company.  Section 6.4(d) of the Merger Agreement states:

(d) Except as expressly permitted by this Section 6.4(d), neither the Company Board nor any committee thereof shall (i) (A) change, qualify, withhold, withdraw or modify, or publicly announce its intention to change, qualify, withhold, withdraw or modify, in each case in any manner adverse to Parent, the Recommendation, or (B) adopt, approve or recommend to stockholders of the Company, or publicly announce its intention to adopt, approve or recommend to stockholders of the Company, a Company Takeover Proposal (any action described in this clause (i) being referred to as a "Change of Recommendation"), or (ii) authorize, cause or permit the Company or any of its Subsidiaries to enter into any letter of intent, memorandum of understanding, agreement (including an acquisition agreement, merger agreement, joint venture agreement or other agreement), commitment or agreement in principle with respect to, or that is intended or would reasonably be expected to lead to, any Company Takeover Proposal (other than an Acceptable Confidentiality Agreement entered into in accordance with Section 6.4(b)) (a "Company Acquisition Agreement") or resolve, publicly propose or agree to do any of the foregoing. Anything to the contrary set forth in this Agreement notwithstanding, prior to the Offer Acceptance Time, the Company Board may, in response to a Company Superior Proposal received by the Company after the date of this Agreement on an unsolicited basis that did not result from a breach of this Section 6.4 , (x) make a Change of Recommendation or (y) cause the Company to terminate this Agreement in accordance with Section 8.1(d)(ii); provided that prior to making such Change of Recommendation or terminating this Agreement in accordance with Section 8.1(d)(ii), (A) the Company shall have given Parent at least five (5) Business Days' prior written notice of its intention to take such action, including the material terms and conditions of, and the identity of the person making any such Company Superior Proposal and contemporaneously provided to Parent a copy of the Company Superior Proposal, a copy of any proposed Company Acquisition Agreement and all related documentation, (B) during such five (5) Business Day period following the date on which such notice is received, the Company shall, and shall cause its Representatives to, use commercially reasonable efforts to engage in good faith with Parent (to the extent Parent wishes to engage), which may be on a non-exclusive basis, to consider adjustments to the terms and conditions of this Agreement, (C) upon the end of such notice period, the Company Board shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by Parent, and shall have determined, after consultation with its independent financial advisors and outside legal counsel, that the Company Superior Proposal would nevertheless continue to constitute a Company Superior Proposal, and (D) in the event of any change to any of the financial terms (including the form, amount and timing of payment of consideration) or any other material terms of such Company Superior Proposal, the Company shall, in each case, have delivered to Parent an additional notice consistent with that described in clause

(A) above of this proviso and a new notice period under clause (A) of this proviso shall commence ( provided that the notice period thereunder shall only be three (3) Business Days) during which time the Company shall be required to comply with the requirements of this Section 6.4(d) anew with respect to such additional notice, including clauses (A) through (D) above of this proviso; and provided, further, that the Company has complied in all material respects with its obligations under this Section 6.4.

40.     Further locking up control of the Company in favor of First Data, the Merger Agreement provides for a "termination fee" of $18 million, payable by the Company to First Data if the Individual Defendants cause the Company to terminate the Merger Agreement.

41.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

42.     Additionally, Company stockholders FTVentures III, L.P., FTVentures III-N, L.P., FTVentures III-T, L.P., and Michael J. Mertz entered into tender and support agreements with First Data, pursuant to which they have agreed to tender their shares in the tender offer. Accordingly, approximately 40% of the Company's shares are already locked up in favor of the Proposed Transaction.

43.     The merger consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

44.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

45.     Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies resulting from the merger.

46.     Moreover, the Company's financial advisors, Financial Technology Partners LP ("Financial Technology Partners") and FTP Securities LLC ("FTP Securities" and, together with

Financial Technology Partners, "FT Partners"), observed that the most recent price targets for the

Company's common stock ranged from $15.00 to *$20.00 per share*, with four price targets at

$17.00 per share.

47.     Accordingly, the Proposed Transaction will deny Class members their right to share

proportionately and equitably in the true value of the Company's valuable and profitable business,

and future growth in profits and earnings.

*The Solicitation Statement Omits Material Information, Rendering It False and Misleading*

48.     Defendants filed the Solicitation Statement with the SEC in connection with the

Proposed Transaction.

49.     The Solicitation Statement omits material information regarding the Proposed

Transaction, which renders the Solicitation Statement false and misleading.

50.     First, the Solicitation Statement omits material information regarding the financial

analyses performed by the Company's financial advisor, FT Partners.

51.     With respect to FT Partners' *Discounted Cash Flow Analysis*, the Solicitation

Statement fails to disclose:  (i) the terminal values for CardConnect; and (ii) the inputs and

assumptions underlying the discount rates ranging from 9.0% to 13.0%.

52.     With respect to FT Partners' *Leveraged Buyout Analysis*, the Solicitation Statement

fails to disclose FT Partners' basis for assuming an illustrative multiple of debt to LTM adjusted

EBITDA at the transaction date of 6.0x and a blended interest rate of 7.1%, as well as a required

internal rate of return for a financial buyer of between 18.0% and 30.0%.

53.     With respect to FT Partners' *Selected Public Companies Analysis*, the Solicitation

Statement fails to disclose the individual multiples and financial metrics for the companies

observed by FT Partners in the analysis.

54.     With respect to FT Partners' *Selected Precedent Transactions Analysis*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by FT Partners in the analysis.

55.     With respect to FT Partners' review of acquisition premiums, the Solicitation Statement fails to disclose:  (i) the selected merger and acquisition transactions observed by FT Partners; and (ii) the premiums in such transactions.

56.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

57.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following section of the Solicitation Statement:  "The Solicitation or Recommendation."

58.     Second, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

59.     Specifically, the Solicitation Statement fails to disclose the timing and nature of all communications regarding future employment and directorship of CardConnect's officers and directors, including who participated in all such communications, particularly when and to whom First Data first indicated its interest in potentially retaining members of management following a transaction, and which members of management engaged in the discussions regarding future employment during the week of May 22, 2017.

60.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that

information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

61.     The omission of this material information renders the Solicitation Statement false and misleading, including, *inter alia*, the following sections of the Solicitation Statement: (i) "The Solicitation or Recommendation"; and (ii) "Past Contacts, Transactions, Negotiations and Agreements."

62.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to CardConnect's stockholders.

## COUNT I

### (Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)

63.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64.     Section 14(e) of the 1934 Act states, in relevant part, that:

It shall be unlawful for any person to make any untrue statement of a material fact
or omit to state any material fact necessary in order to make the statements made,
in the light of the circumstances under which they are made, not misleading . . . in
connection with any tender offer or request or invitation for tenders[.]

65.     Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not misleading.

66.     The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

67.     The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

68.     By virtue of their positions within the Company and/or roles in the process and the

preparation of the Solicitation Statement, defendants were aware of this information and their duty

to disclose this information in the Solicitation Statement.

69.     The omissions in the Solicitation Statement are material in that a reasonable

shareholder will consider them important in deciding whether to tender their shares in connection

with the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate

disclosure as significantly altering the total mix of information made available.

70.     Defendants knowingly or with deliberate recklessness omitted the material

information identified above in the Solicitation Statement, causing statements therein to be

materially incomplete and misleading.

71.     By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

72.     Because of the false and misleading statements in the Solicitation Statement,

plaintiff and the Class are threatened with irreparable harm.

73.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (Claim for Violation of 14(d) of the 1934 Act Against Defendants)

74.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

75.     Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or
reject a tender offer or request or invitation for tenders shall be made in accordance
with such rules and regulations as the Commission may prescribe as necessary or
appropriate in the public interest or for the protection of investors.

76.     Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in
section 14(d)(1) of the Act with respect to a tender offer for such securities shall
include the name of the person making such solicitation or recommendation and
the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101)
or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

77.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

78.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

79.     The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

80.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### (Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and First Data)

81.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

82.     The Individual Defendants and First Data acted as controlling persons of CardConnect within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of CardConnect and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did

14

influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

83.     Each of the Individual Defendants and First Data was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

84.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Solicitation Statement.

85.     First Data also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

86.     By virtue of the foregoing, the Individual Defendants and First Data violated Section 20(a) of the 1934 Act.

87.     As set forth above, the Individual Defendants and First Data had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

88.     As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

89.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.     Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  June 12, 2017                              **RM LAW, P.C.**

                                        By:  */s/ Richard A. Maniskas*

**OF COUNSEL:**                              Richard A. Maniskas (PA Bar No. 85942)
                                             1055 Westlakes Drive, Suite 3112
**RIGRODSKY & LONG, P.A.**                   Berwyn, PA 19312
Brian D. Long (PA Bar No. 82370)
Gina M. Serra (PA Bar No. 308207)

2 Righter Parkway, Suite 120                    (484) 324-6800
Wilmington, DE 19803
(302) 295-5310                                  *Attorneys for Plaintiff*